This time we'll hear Kiobel v. Cravath, Swaine & Moore. Thank you. Thank you. Good morning. Thank you, Judge Jacobs, and may it please the court. My name is Neil Katyal. On behalf of Cravath, I'd like to reserve three minutes for rebuttal. The district court here made two errors, either of which requires reversal. First, it construed Section 1782 to permit discovery from a lawyer holding a client's document. And second, it misread the four intel factors. On the first- Documents privileged, do you assert privilege? We assert the type of privilege that was at issue in sereo, so not attorney-client privilege. But as this court said in sereo, there's a second kind of privilege, a privilege when you're exceeding the statutory bounds of Section 1782 and when it squarely implicates the attorney-client privilege. The documents in sereo were provided to the lawyer for purposes of advice, weren't they? They were, absolutely. Clearly within the traditional attorney-client privilege. And isn't that what Ratliff recognized? That's absolutely right, Your Honor. But both in sereo and Ratliff, they had one key feature, which this case doesn't. And that feature was disclosure, in some ways, to other folks. For example, in your opinion in Ratliff, you said it'd be a curious and unacceptable result for the court if the price of turning over documents was to allow them to be exposed and to get 1782 discovery. In terms of obtaining the attorney's advice, that's correct. Correct. I don't know that the same holds true when those documents have been produced to a third party in a proceeding that's now ended. And the lawyer remains merely just a person who's hanging onto the documents that were, they may very well belong to your client, or to your client's client, but you don't assert any kind of privilege. There's nothing that protects them within the traditional attorney-client privilege type of arrangement. So Judge Wesley, a couple of things. First is, I don't think that the privilege we're talking about is limited to attorney-client privilege. This is the language of Judge LaValle's opinion for the court in sereo at page 146. I'm very familiar with sereo. Yes. So that language, then, says there is the attorney-client privilege, common law or constitutional. But then it says that its reasoning would seem to apply also where the documents are not amenable to subpoena because they lie outside the statutory limits. Is that necessary for the decision, sir? I don't think it was necessary. But you're asserting privilege. So that's Judge LaValle's hypothetical expositing on what would have case, but that was clearly what was in play at Ratliff. Ratliff, there was no privilege claim. The documents remained in the possession of Davis Polk because Davis Polk represented Ernst & Young, a Netherlands corporation. And the question was, do they have to turn them over? And the answer was yes. And now Justice Sotomayor and Judge Newman agreed. Absolutely. We're not here at all quibbling with Ratliff. I guess I'd say, too. If you're right, if you're right, I'm practicing law in New York. And I've got a client in the Netherlands who's got some very sensitive documents. And the client says, I don't want anybody looking at these. I'm not asking you to make any judgments on them, but I'm delivering them to you. Have you cauterized the ability of anybody in the United States to come into the Southern District and seek their discovery? Well, Judge Wesley, as I've been trying to say, this case is so far from that because this was the provision of legal documents to Cravath for purposes of legal advice. That is, this was done to review all of those documents. You don't assert privilege. You just claim privilege. So please don't tell me what the purpose was, because you're not asserting privilege. Judge Wesley, my point is at the time that the documents came to Cravath, they were just like the standard cases we're talking about, a client giving documents to an attorney, going back 200 years, all the way back to Wigmore in cases from this circuit. That is a circumstance in which you can't go after the lawyer to get the client's documents. Now, you're absolutely right to say, in your opinion in RATLAF for the court, there was a second feature, which was disclosure to the SEC. And our point, both with respect to the statutory error, as well as the four Intel discretionary factors, and in particular, Intel Factor 4, is that this case looks nothing like RATLAF. And the reason is, what you said for the court in RATLAF was, quote, we are hard-pressed to suppress documents that have already seen the bright light of public disclosure. Those documents were given to the SEC. And you went on to say, transmitting the documents created a favorable impression for Ernst & Young, but it did not insulate its documents from review by other interested parties. This is not that case. This is a case in which the confidentiality order found at Joint Appendix page 55 to 64 expressly sealed these documents. They gave them to the other side only for the purposes of this litigation and nothing else. And it reserved all rights, all privileges, all arguments for why that material maintains its confidentiality. And if you were to, I think, embark on it. Confidentiality doesn't trump discovery. It just protects against disclosure. So if something's simply confidential, that doesn't mean it's not subject to disclosure. It just means, subject to the subpoena, it just means that you can't tell anybody else what to read, right? And our point is that you can't tell anyone, when these documents were turned over to the other side, they were for that purpose and nothing else. And as the amici warn, this would be a grave change in the law. The New York City Bar Brief and the US Chamber of Commerce Brief says, no case has ever accepted the idea that by turning documents over in a sealed communications channel, that you can go after the lawyer. And that really is the difference, whether you call it statutory or you call it Intel Factor 4, between this case and all of the other cases. So Schmitz, for example, said, yes, there was this confidentiality order, and it limited the documents to really the parties and nothing else and for no other purpose. And for that reason, Intel 4 cut very strongly in favor of non-disclosure. The difference is, like a case like US versus Phillips, in which the confidentiality order said, anyone can get these documents. They anticipated that. These parties agreed to certain terms. Those terms were, yes, you get to see these documents, but only for purposes of this case and nothing else. And we reserve all rights. And it'd be a really massive change in the law, as the amici point out, for you to say, because Cravath essentially did the right thing as part of a negotiated agreement with both sides, to say you can look at him for one purpose, that somehow that vitiates the type of privilege that was issued in Sario. Now, I'll concede you on the statutory point, on the statutory first error. There's no square case that says what we're saying. But we think that the logic. You would have to turn on the confidentiality agreement, wouldn't it? It does, exactly. And so, just as Intel Factor 4 does, you can call this either discretionary. I'm not talking about Intel. I'm talking about upfront, in terms of the fact that this makes us somehow different because of the confidentiality. Correct, Your Honor. So we're not here saying that any documents that someone wants to hide or something like that, give it to an attorney. The amici are, but not you. Excuse me? The amici are, but not you. I don't even think the amici are going quite that far. But certainly, we don't urge you to go that far. I think here, this is an agreement in that joint appendix pages that is as clear as day. And it says, only limited to this and nothing else. And that is, if you accept their invitation, you will be disincentivizing all of those agreements. And you'll tie district courts up in litigation fight after litigation fight, disadvantaging the private bar as well by forcing them to destroy documents, and all kinds of things. These orders, these confidential orders are entered into for really important reasons. And it's a real change. Does the record show for what purpose Cravath, presumably at the direction of its client, preserved all these documents here in New York? I don't think the record explains precisely why. But as the briefs say, oftentimes they're convenience so that they'll keep the documents. Sometimes there may be disputes that arise between clients and attorneys that are known to happen. Including disputes as to whether there's a violation of a confidentiality order. Sure, absolutely. It could be. The record doesn't disclose why. But I think the confidentiality order itself actually says, look, there are certain people who can get access to these documents, including all the attorneys and the like, but not foreign courts. And that was just so far beyond what was anticipated in this 2002 confidentiality order. Is it your view, then, that the confidentiality agreement in essence constitutes a waiver by Kia Bell from her ability to subpoena these records for alternate proceedings? No, I'm not saying it's a waiver. I'm just saying it makes the case look like Schmitz or any one of the cases in which it's always been a sealed communications channel. And so by turning over the documents to the other side, I don't think that makes the case different. It answers, I think, what you were asking me initially. There's one last point I'd like to make. I've said there's two different errors. One is the statutory, and one is the four intel factors. And we've talked about intel factor four, but I think it's very important to look at intel factor one. Because intel factor one asks, who is the party in the foreign proceedings? And now we know that party in the foreign proceedings is Shell. And the proper way to do this is for them to try and seek it from Shell. The district court, Judge Hellerstein, really got this wrong. It ignored the language in Schmitz at page 85, which is as clear as day. It says the real party is not the attorney. It's the client. And here, that client, Shell. Is that for the purpose of the discretionary analysis? Exactly, for discretionary analysis factor one. But only the discretionary. And the statute is pretty clear. I mean, the party is here. Kravath is here. The party, Kravath is certainly here. But I don't think that, I think that for purposes of reading the statute, our point to you is to say that the lawyer can't be read as the person from whom discovery is sought. That you should construe the statute against 200 years of background common law tradition that says that you can't. Unless, as you conceded earlier, the lawyer is functioning as the safe in which damaging documents are concealed. So, I mean, there's certainly exceptions, false crime, fraud, all those kinds of things, certainly. But our point is when it's documents like these, as this case comes to the court, there's no allegation of anything like that. Are these original documents or a set? I assume that they're a set and not the actual originals. But I will confer and maybe get back to you in a little. Deposition testimony and other things, isn't it? Right, so the deposition testimony, I think, is different because that wasn't material that was located abroad that is brought into the United States for purposes of this. But this is all generated here. But certainly for discretionary, the four intel factors, we think the analysis would apply. How does the deposition testimony fit within your, I mean, clearly 1728 or 82, whatever it is, I always get the numbers wrong. How does that, I mean, you did the deposition, your client did the depositions, your client possesses it. That's clearly, they may be owned by Shell eventually, but they're not documents sent into the United States. Your argument there doesn't seem to be this fit. So I concede you it doesn't fit the statutory factors, but attached to the depositions and in the depositions is some confidential material akin to, that is covered by the protective order. And our point is, for purposes of the discretionary factors and in particular factors one and four, any one of which would be enough to merit reversal, that's why the problem occurs. What exactly in your view is the significance of the commencement of proceedings in the Netherlands? What is the significance of the fact that these parties are presently before a Dutch tribunal? Exactly, Judge Cabranes, we think that it really guts their arguments on intel factor one, because in Schmitz, this court at page 85 said, the lawyer is not the party, it's the client. And so the question that you have to ask is, who is the party in the foreign proceedings? We now know that party, it's Shell, and that's precisely whom they're trying to get the documents from. Schmitz in analyzing intel factor one says, that boy cuts the other way, and Judge Hallerstein got it absolutely wrong. And again, any one error on any one of these is enough, I think, to merit reversal on the discretionary factors. If there are any other questions. We'll hear you on rebuttal. Good morning, your honors. Marco Simons for Petitioner Esther Keobel. This case is a narrow discovery dispute. It concerns documents physically present in New York, indisputably relevant to Esther Keobel's claims in the Netherlands, and that are not burdensome to produce. As long as these documents are not privileged, and they are not, the district court was free to exercise its discretion to grant discovery. Mr. Simons. Yes, Judge. If I may just pursue the same question that I asked Mr. Katchel. You've now initiated an action in the Netherlands, or at least your client has. That would seem to cut against the propriety of a section 1782 petition. Why should American courts be open for the purpose of facilitating that particular litigation? You can get the documents presumably in the Netherlands, right? Well, your honor, I think that kind of reasoning is exactly what this court has repeatedly rejected as a quasi-exhaustion requirement under section 1782. And that is essentially what Cravath is arguing here for, is that if there are proceedings going on in the Netherlands, we should go to the Netherlands court. You know, before the district court, they argued that our planned filing of the suit in the Netherlands was too inchoate to allow 1782 discovery, and now they argue that because we have filed the suit in the Netherlands, we're not entitled to 1782 discovery. So I don't think it actually materially changes the basis for Judge Hellerstein's order in any way for several reasons. First, because there were two independent bases for Judge Hellerstein's order under Intel Factor I. The first basis was that, and contrary to what Mr. Cotchiel suggested, Judge Hellerstein recognized that Shell was sort of the real target here. There's no legal error there. He fully accepted that while Cravath was the nominal target, we were actually seeking evidence from Shell. But he said that discovery may still be appropriate because there are barriers to obtaining the documents in the Netherlands. That still hasn't changed, because even though the case has been initiated in the Netherlands, as the evidence in the record indicates, the Dutch court is still, at the moment, without the ability to order production from Shell. But even if it could, and Judge Hellerstein specifically recognized this, even if the Dutch court could, at the moment, order production from Shell, Shell likely does not have all the documents, and it is simply more efficient to have a court here, where the documents are, simply order Cravath to turn them over, rather than going through a cumbersome, multi-step procedure, where a Dutch court would have to use its judicial resources to entertain multiple discovery requests. It doesn't seem like a big deal. I mean, and I believe your Dutch lawyer conceded that you can get some discovery in aid of jurisdiction in the Dutch court. It's under a different name, it's not discovery, I forget what it is. It's extremely difficult to do in the Netherlands, Your Honor, but the fact remains that Judge Hellerstein found that Shell was not likely to have all the documents. That was not an abuse of discretion for him to find that. In fact, this court has never. Does anyone think that Shell would have the slightest difficulty in getting Cravath to send any missing documents, or the whole thing? I don't know, Your Honor. I don't know what Dutch law is on that question. I don't know whether Shell would. Lawyers act on behalf of their clients, that's why they turn the lights on. Of course, Your Honor, but I don't know whether, if they were asked in the Netherlands, Shell would attempt to impose any kind of privilege, or make the same arguments about confidentiality agreements as a barrier to production in the Netherlands. It's simply another step that 1782 was designed to avoid. The twin aims of Section 1782. If they were available there, we'd have cases that say the fact that they might be available doesn't make an abuse of discretion to decide to produce them here. Absolutely, Your Honor. And we're talking about, I mean, Hellerstein went through each of the four factors. And to abuse his discretion, it has to either seem arbitrary, or he has to make a mistake of law. He has to employ a wrong standard. So we would have to conclude that his view, that even though, at the time that he was considering it, there was not a proceeding in the Dutch court, that somehow he abused his discretion by knowing that there may eventually be a proceeding in the Dutch court, and that the Dutch court may or may not be able to order these documents to be provided. And so he weighed those things, and made those decisions. And then we have to decide whether it abuses discretion. I agree, Your Honor. And again, he accepted the possibility that even if the Dutch court were able to order it from Shell, as he said at the oral argument, that would add a layer of complexity that is needless to this case. And this court has, on multiple occasions, accepted that even though the party from which discovery is sought may be a participant in the foreign proceedings, that does not bar Section 1782 discovery. Mr. Kotchalak's a more preliminary argument that I'd ask you to address. And he says that, well, because of the fact that there's a confidentiality agreement, the reason that these documents are here is only because of the confidentiality agreement. And although his client, Cravat, does not assert the privilege that is due Shell and it to protect those documents, were they delivered here for legal advice or fit within the confines of a privilege, that somehow this changes the equation with regard to 728. It makes this different from Ratliff. And I'd like to have you address that. Yes, so first, Your Honor, I understand you'd be asking about the confidentiality order. But it's clear that the protection that was discussed in Sario is not applicable here. These documents are not privileged. Sario was all about privilege. I agree. Sario was about privilege. And I think we tried very hard in Ratliff to make it clear that Sario was not about privilege, or was about privilege. Yes, Your Honor. And that Ratliff was not. And in Ratliff, the documents were produced by Ernst and Young because the SEC was doing an investigation into one of its clients. And so they were assisting in producing those documents. And they didn't assert privilege. The documents originally were produced for some legal advice, were delivered for some legal advice. But curiously, Davis-Polk made a decision to change its position in that regard. And Your Honor, with respect to the confidentiality order, that does not change things here for a number of reasons. So first, this is not a case where we're seeking to disclose these documents publicly. What happened at the district court was Judge Hallerstein ordered us, and we stipulated with Cravath to essentially an adaptation of the original confidentiality order to the new circumstance here. There was no litigation over the substance of that. If Cravath wanted greater protections, they could have argued for it. But they stipulated to the order that was entered. So we believe that they've actually Maybe I misunderstood. But I thought his argument to be, look, when these documents were originally produced, they were produced for only a specific purpose. And that purpose was met in the context of the Kiobel litigation. And they could not be produced for any other purpose. And so therefore, to use 17, this disclosure procedure, now does an end run around that original agreement. Sure, Your Honor. I guess I have several responses to that. First, that's no different from a number of other cases in which confidentiality agreements have been modified to allow discovery to be used in related litigation. So for example, this court's opinion in the Agent Orange case, which was actually about unsealing documents publicly, looked at a number of factors of that confidentiality order which are on all fours of the confidentiality order in this case. So for example, the fact that it was a stipulated confidentiality order and not a court order protective order, the fact that it was a blanket confidentiality order that allowed parties to designate a large number of materials, the fact that there is no good cause shown and no good cause ordered as to any particular document in that case, and the fact that it allowed that it was a temporary protective order in the sense that it only applied to the pretrial stages of the litigation, just like the one here. So these confidentiality orders have actually been modified in many cases to allow discovery, even where there isn't a statute where Congress has a purpose to facilitate discovery, like in section 1782. Which parties here would modify it? Excuse me, Your Honor? Which parties here would modify it? I don't think the protective order needs to be modified at all, frankly. Well, you referred to its modification. Well, it's Cravath that argues that Judge Hellerstein erred by not meeting the standards for modifying the protective order, an argument not made below. But if Judge Hellerstein didn't need to make that statement. I understand it. Judge Hellerstein felt it was necessary to get Cravath to sign and to consent to the modification of the confidentiality order. But of course, Cravath was not a party to the original confidentiality order. Cravath signed it, Your Honor. They signed it as an attorney. They signed it on behalf of somebody else. Well, Cravath himself argues that they are bound by it. They may be bound by it, but I'm not sure they were in a position to modify it on behalf of Shell. I don't think they could have unilaterally modified it, Your Honor. But the court had full ability to modify it. That's one of the aspects of this confidentiality order that that is important here, that it was subject to modification by further order of the Southern Union of New York. I'm concerned about the possibility of this becoming an abuse. Now, courts have jurisdiction to decide their own jurisdiction, and they can order discovery to decide their own jurisdiction. And in ATS cases, jurisdiction will often turn on where certain things happened. And so if a lawsuit is brought in the United States, in order to decide jurisdiction, there can be discovery under American principles, which are very broad in searching, to find out what happened where. Now, all of that takes place here. And then ultimately, if it's decided that there's no jurisdiction here because insufficient activity took place in the United States, then a lawsuit is started in another country. And then we're off to the races, because all the American discovery, with respect to what happened where, gets provided, as in this case. And so it looks as though it can develop into an abuse. Your Honor, I would have two responses to that. First of all, that's not what happened here in this case. So this case was litigated. I understand that. We have to think about other cases. Sure, Your Honor. But in this case, it was litigated for over 10 years on the merits. The purpose of this discovery was to allow Ms. Kiobel to prove her claims on the merits against Shell. That is exactly the purpose that it would be put to in litigation in the Netherlands. So Shell is not losing anything by this. Their expectations are not upset here. But with respect to the potential parade of horribles that might come down the road as a result of this. Why isn't Shell's expectation that Ms. Kiobel would abide by the stipulation that she signed? Ms. Kiobel has abided by the stipulation that she signed, Your Honor. At the outset of the litigation, nobody should be expected to think of every eventuality that may come up when they're crafting a confidentiality order. That's why it's subject to court modification. Nobody could have anticipated what happened here. Neither side did, Your Honor. And so the confidentiality order allows modification by uncourt order. It also specifically contemplates that parties may be subject to subpoena for these documents at some point. But with respect to Your Honor's broader point about what happens down the road, this court said less than two weeks ago in the In Re Accent Delight International case, in response to a similar argument that maybe this legal principle could lead to abusive 1782 litigation, the court said, we are confident that in the mine run of cases, the adversarial system and the district courts in their discretionary review will be able to weed out abusive Section 1782 applications. If that starts to happen, the courts will deal with it. But this court has never overturned a discretionary grant of discovery under 1782, and it should not start now. I hear you correctly to say that the argument that Keobel had somehow conscribed her ability to seek this relief by entering into the confidentiality agreement in her original litigation in the United States was not made to the district court? I'd have to look to see exactly how it was framed. The argument that wasn't made to the district court was that the court needed to meet some standard for modification of the protective order. So the argument that the court needed to meet the standard under Martindale or SEC v. The Street, that is nowhere in Cravath's arguments before the district court. Instead, before the district court, Cravath argued that they would have no assurance that the documents would remain confidential. That's what I thought they are. In the Netherlands. And that's what the stipulated confidentiality order, in this case, was designed to address. Mr. Simons, maybe you could, at the simplest level, what exactly are the documents at issue here? And do you know what these documents are? I know what some of these documents are because I was counsel to the WEWA plaintiffs in the underlying litigation, Your Honor. I don't have complete recollection of all of them. But they're discovery documents and deposition transcripts. The deposition transcripts, as Mr. Katyal alluded to, are key in this case because there is no argument that those documents are subject to any kind of protection under SARIA or otherwise. And so there shouldn't be any question that the court was well within its discretion to order production of those, including the exhibits to those declarations, to those depositions, by the way, as this court did in the Optimal Investment Services case, ordering a production of a deposition transcript. I'm trying to understand your effort as a lawyer. So you have a very good idea of what these documents are. And now you're in a proceeding in the Netherlands. Is there any reason why, based on your current knowledge, you can't identify the documents with enough particularity in the Dutch proceeding to achieve all of these objectives? That may not be the test under Section 1782. I'm just asking whether, as a practical lawyering matter, you can't achieve all that you want to achieve by proceeding in the Dutch court. Sure, Your Honor. Frankly, I am not superhuman. I do not have tremendous recall over what these documents are, but also the legal questions in the Netherlands case may be different and distinct. All these documents are indisputably relevant to the Netherlands case, but the issues of jurisdiction over Shell's Nigerian subsidiary, which is likely to be the first issue litigated, are gonna turn on specific questions, specific to Dutch law, that certainly were not in my mind when we were litigating the Wiwa case. And the level of specificity needed to ask for these documents in Dutch court is beyond what I recall from the record in this case, Your Honor. Let me ask you to turn, if you would, to footnote six in our decision in Schmitz against Bernstein, et cetera. In 2004, we seem to have avoided very carefully, let me just read you the language, the difficult question posed by Cravath in that case, whether Section 1782 applies to documents only temporarily present in the jurisdiction for the purpose of discovery in another case. So we said there that we were avoiding deciding that difficult question with respect to our understanding of the scope of the Ratliff decision. What do you make of that? Well, two things, Your Honor. First of all, I don't think that was in reference to the Ratliff decision. I don't believe Schmitz cited Ratliff, unless I'm mistaken, Your Honor. But I would say that question is also not presented here, because Cravath hasn't argued that these documents were temporarily present in the jurisdiction. They've been here a long time, Your Honor. But even if they were. They would have been here if they weren't for the original litigation. But for, certainly, they wouldn't have been here. But Section 1782 doesn't involve any analysis of why the documents are here, so long as they're not privileged. I think the court's decision in In re Edelman is instructive on this. Edelman concerned the question of whether an individual who was temporarily present in the United States was subject to deposition under Section 1782 through tagged jurisdiction, essentially. And this court said that found in under that statute simply means settled principles of territorial jurisdiction. And in our view, there's no reason that if an individual who's simply passing through New York can be subpoenaed for deposition under Section 1782, that documents that have been sitting in a warehouse in New York for 10 years now shouldn't be subject to production. It's simply the most efficient thing to do that satisfies the aims of the statute. You don't dispute the fact that Shell originally gave these documents to Cravath for purposes of advice of counsel? I do dispute that, Your Honor, because we're talking about two different sets of documents here. I don't care about whatever set of documents Shell gave to Cravath for advice and counsel. That universe may be much larger than what's at issue in this case. I only care about the set of documents that Cravath produced to the plaintiffs in this case for which no privilege ever could have attached, Your Honor. Thank you. Why do you suppose, I mean, you referred to warehousing or storage. I mean, Cravath is not a storage facility. Isn't it fair to assume that if they're holding these documents, they're holding it in order to serve their client? I'm not willing to make that assumption, Your Honor. In this case, Cravath may well be a storage facility. They said the documents are in a warehouse, and Ratliff specifically says it's no different than if they're in a warehouse, but in this case, they actually are. They forgot about them and they didn't ship them back? Maybe they forgot about them. Again, I don't think any of that matters. The documents are here, they're relevant. It's the most efficient way of assisting foreign courts and litigants, which is one of the twin names of Section 1782, and there was no abuse of discretion here. They're not privileged in the context of the attorney-client, nor do they have a particular privilege for which Shell itself could assert on its own. Well, because then Cravath could assert that privilege also. I mean, it's pretty much recognized that in the taxpayer cases. If any of that set of documents was actually inadvertently produced and was privileged, I believe that even the new confidentiality order still contains a clawback provision, Your Honor, that mirrors the old one. So if a document was produced 15 years ago that shouldn't have been produced and is subject to a claim of privilege, Shell can still claw that document back under the new confidentiality order. So there's no question that privileged documents are not at issue. In fact, Cravath conceded an oral argument below that we're not talking about privileged documents here. Thank you. Thank you, Rebuttal. Thank you. This is about as far from a narrow discovery dispute as one could imagine, as the amici briefs point out. And as Judge Jacobs, you said, the possibility of discovery tourism means that if you accept the invitation here, we'll be off to the races in case after case. There is zero- Did you catch a witness in the United States in the Southern District who knows something about the extraction of oil in Ecuador and Chevron's activities with regard to that? You can take their deposition here, can't you, Mr. Cratchit? In fact, that's exactly what happened in the Chevron case. There were multiple depositions taken here and documents disclosed with regard to an Ecuadorian litigation after the fact. Absolutely, we're not here disagreeing with that. The difference with that case and this one is fundamental. This is about going after the lawyer. There is not a single case, Judge Wesley, anywhere that they have given you that says that you can go after the lawyer and get those documents. This statute's been around since- In Ratliff, they were produced with regard, they were delivered to the SEC for a particular purpose. Correct, and the reason why- And there was a different purpose for which the subpoena was sought in the 1782 proceeding, right? Judge Ratliff- It was an entirely different purpose that they sought those documents, wasn't it? Judge Wesley, I heard you say that you'd written Ratliff to deal with this, but with all due respect, I can only take the court at its word- You know what I hear when you say, all due respect, don't I? You and I have actually discussed this. Oh, I think we have, and footnote six makes clear that you're writing the holding only limited to those documents which have been given to the SEC and the bright light of public disclosure. This is not that. This is the exact opposite. But that was dealing with whether there was any attempt to even assert a privilege. That's what we were talking about there, with all due respect, Mr. Chairman. And with all due respect back, Your Honor, I would point out that Sario itself recognized there's two forms of privilege. And I just, I'm worried that we're getting into a red herring. No, I understand that. If there were, that's why I asked the question before. If there were a privilege that were particular to Shell, the fact that Shell delivered the documents to you doesn't, Shell doesn't lose its privilege by giving them to their lawyer. Right, so we're talking about documents here that are otherwise protected. That's your language in Ratliff. And our point is they are otherwise protected under the terms of the confidentiality order. This statute's been around since before I was born. Did you make that argument to Judge Hellerstein below? Because I didn't see that argument made to Judge Hellerstein. I do think that we made it. Our reply brief at page 11, I think, goes into and gives you sites for that. So, yes, page 11 of the reply brief. But my point is this statute's been around  Every client, every litigation would love to be able to get the documents from the attorneys. It's never happened. There's not a single published decision, which is why we think the statutory argument is so strong. Now, the other part of this is the Intel discretionary factors, which I do think merit reversal, and in particular Intel Factor 4 and Intel Factor 1. The confidentiality order here, as Judge Jacobs was saying to my friend on the other side, is ironclad. And what they are seeking to do is not just modify the confidentiality order, which would have the highest standard imaginable, the Martindale, which I don't think they've come close to meeting, but they're actually asking for a whole new order because the documents they had have been destroyed now. And so they're asking for a new, they're invoking the judicial power of the district court to order the production of documents from Cravath. That's not modifying some old order. That's actually seeking a new one. And that's a clear derogation of what they agreed to back in 2002 because that confidentiality order is as clear as day at page 858 of the joint appendix, which says we're only agreeing to this for this. We're not waiving any of our claims anywhere. And if you accept their invitation, you will be incentivizing this kind of discovery litigation tourism on behalf of not just one country, the Netherlands, but 194. And if you want any proof of that, the case that he just cited to you in reaccent, he filed a 28-J letter about the unpublished aspects of that decision. But this court's decision in reaccent two weeks ago says, once you give 1782 discovery to a party, they can use it anywhere. Imagine the possibilities if now the shells of the world have to worry about 194 different legal systems getting access to information because of the broad rules, as Judge Jacobs was saying, about the U.S. discovery system. We have a proud system which allows for broad discovery under the auspices of negotiated protective orders. They are seeking to undo that, which would unravel really the way litigation unfolds. That's why the New York City Bar Brief and the U.S. Chamber of Commerce Briefs are so important. Thank you. Thank you both. Final question. There is another question. I have a little something, a little something. We've heard that the Second Circuit has never reversed the Section 1782 decision by a district judge. What do you make of that? First of all, is it accurate in your view? I think that probably is accurate. District courts generally have done a very good job policing 1782 because they have never opened the door to this kind of thing. I mean, we have no case in this circuit or any other in which attorneys are getting confidential information from their clients. This would be a first. And, you know, Judge Hellerstein, I think, you know, intel factors two and three are certainly debatable. I think the briefs on both sides air that out, but intel factors one and four are not. And this is the quintessential case in which there was an abuse of discretion. And, you know, the implications here are not small, as Judge Jacobs was saying earlier. Thank you. Thank you both. We'll reserve decision. In the case of Massimino v. Fidelity Workplace, that is taken on submission. That's the last case on calendar. Please adjourn the court. Court is adjourned.